# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs May 13, 2009

## STATE OF TENNESSEE v. SAM AVERY WILHOITE

**Direct Appeal from the Circuit Court for Bedford County**
**No. 16373      Lee Russell, Judge**

_____

**No. M2008-01190-CCA-R3-CD - Filed July 24, 2009**

_____

The defendant, Sam Avery Wilhoite, was indicted on ten counts of forgery involving five forged checks. A Bedford County Circuit Court jury convicted him of eight counts of forgery and lesser-included charges on two of the counts. The trial court merged five of the counts, including the lesser-included convictions, with the five other counts and sentenced the defendant to an effective term of eight years in the Department of Correction. On appeal, he challenges the sufficiency of the evidence and the sentence imposed by the trial court. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID H. WELLES and ROBERT W. WEDEMEYER, JJ., joined.

Michael J. Collins, Assistant Public Defender, for the appellant, Sam Avery Wilhoite.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; Charles Frank Crawford, Jr., District Attorney General; and Michael D. Randles and William B. Bottoms, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTS

This cases arises out of the taking of Cathy Gladney's purse and checkbook and subsequent cashing of five unauthorized checks written on her account.

Cathy Gladney, sole employee of Lab Corp in Tullahoma, testified that she laid her purse on a chair in the kitchen of her work building when she arrived at work on July 9, 2007. She recalled that Lori Beth Mooningham came to her office that day for a urine drug screen. While Mooningham was in one of the restrooms and Mrs. Gladney was drawing someone else's blood, Mrs. Gladney

noticed two men standing in the kitchen. Mrs. Gladney asked the men to leave and noted that the kitchen had signs saying "Do not enter" and "Employees Only."

Mrs. Gladney testified that she realized her wallet was missing when she went to lunch that afternoon. She called her husband to make sure she had not left her wallet at home and returned to Lab Corp to search for it there. Realizing that her wallet had been stolen, Mrs. Gladney called the Tullahoma Police Department to make a report. Mrs. Gladney also signed an Affidavit of Forgery with her bank, indicating that she did not write or authorize the checks numbered 2969, 2971, 2972, 2973, and 2975. Mrs. Gladney said she lived at 798 Cat Creek Road in Manchester and did not know the defendant. Mrs. Gladney acknowledged that there were approximately six other people in the building at the same time as Mooningham but said she saw no one other than the two men in the kitchen that day.

David Gladney, Cathy Gladney's husband, testified that he called the bank and cancelled all of their accounts and credit cards after Mrs. Gladney realized her wallet had been stolen. Later, when the bank sent copies of the checks written on their account, Mr. Gladney noticed that the checks had been cashed at Two-Way Market. He called Tim Williams, the owner of Two-Way Market, to inform him that neither he nor his wife had authorized the checks. Williams told Mr. Gladney who had been passing the checks, and Mr. Gladney contacted Detective Farris with the Bedford County Sheriff's Department with that information.

Lori Beth Mooningham testified that on July 9, 2007, she went to Lab Corp in Tullahoma for a drug test as required for her promotion to assistant manager at the Dollar General Store in Shelbyville. Mooningham's two-year-old son; her boyfriend, David Jason Wilhoite; and her boyfriend's father, the defendant, accompanied her. She recalled that the defendant went with them "because he was going to check on some painting that he had to do for this lady[.]" When they arrived at Lab Corp, Mooningham, her boyfriend, and her son went inside, while the defendant remained outside in the car. However, the defendant "kept coming in asking how much longer we [were] going to be. And he came back in and asked where the restroom was [located]." Once she finished her test, she returned to the car where the defendant was waiting in the backseat.

Mooningham testified that she did not take the defendant to check on the painting job because the defendant "said that he had called the lady and she wasn't going to be home and he wanted to ride back to town." During the drive, the defendant "was sort of kind of laughing and was talking about spending other people's money." She returned to Shelbyville, dropped the defendant off at Budget Motel, and went to work. The defendant called her while she was at work and asked her to take him to get "some money . . . for some work he had done." After work that evening, Mooningham picked up her boyfriend and the defendant and drove to a woman's house "between Bell Buckle and Wartrace" at the defendant's direction. Mooningham said the woman's house was nowhere near Manchester.

Mooningham testified that when they arrived at the house, the defendant went inside for approximately five or ten minutes. When the defendant returned to the car, he had a blank check that

he asked Mooningham to fill out. The defendant explained to Mooningham that the woman owed him money for work he was doing for her, but she was "too feeble to write [the check] out" and her husband was gone. Mooningham filled out the check and the defendant walked back to the house to an elderly woman sitting in a wheelchair. The defendant showed the woman the check, gave her a hug, and returned to Mooningham's car. On the way back to Shelbyville, the defendant said he was going to try and cash the check, so Mooningham dropped the defendant off at CF's Food Town. At trial, Mooningham identified check number 2969 in the amount of $120 and signed "Cathy Gladney" that she filled out for the defendant. The defendant told her to leave the payee line blank because "he didn't have an ID to get it cashed."

Mooningham testified that two days later, the defendant called her again asking for another ride to the woman's house because she was going to "give him an advance on some money because he was going to do some painting." She drove the defendant to the same house, the defendant went inside, and he returned to the car with a blank check numbered 2972. The defendant told Mooningham that the woman was still alone and could not fill out the check. Mooningham filled out the check, the defendant took it back inside, and then he returned to the car. Mooningham drove the defendant several places in an attempt to cash the check and then finally dropped him off "down on the river." At trial, Mooningham identified the check written in the amount of $135 and signed "Cathy Gladney." She noted that a phone number written on the check and Two-Way Market on the payee line were not in her handwriting.

Mooningham testified that the defendant asked her if she would cash the check for him at her bank, but she refused because she "didn't know the people personally . . . [or] know if the people's check was even good." She recalled that at some point when the defendant was in the car with her, he "made a statement like, I wonder if they're missing their money now . . . and was just laughing." Mooningham stated that she filled out the checks for the defendant because he "ha[d] made several threats toward [her]" in the past, and she "kn[e]w how he was when he got mad."

Tim Williams, owner of Two-Way Market, testified that he and some of his employees cashed five checks written on the account of David and Cathy Gladney in July 2007. Williams explained that he knew which employee accepted each check because the employees initialed the tops of the checks. Check number 2969 was cashed by Stephanie Bellinger. Check 2971 was cashed by Angel Warrick. Check 2972 was cashed at Two-Way Market, but Williams could not tell who accepted it. He thought that Jannie Carmona may have been the employee who accepted that check because she was "[t]he only one that would usually write telephone numbers" on the checks and that check had a telephone number on it. Check 2973 was cashed by Jannie Carmona. Williams recalled that he cashed check 2975. All of the checks were stamped "For Deposit Only" on the back.

Williams testified that the check he personally accepted and cashed, he did so for the defendant whom he had known for at least eight years. When the defendant presented the check to Williams, he said that he had "d[one] work for these people." Williams stated that when cashing checks, he normally called the bank to make sure there is enough money in the account to cover the check. However, it was after bank hours when the defendant arrived to cash the check, so he left a

-3-

note for his employees not to take any checks from the defendant "until [he] could get this verified." Before the account could be verified, Jannie Carmona cashed another check for the defendant on the Gladneys' account. Williams pulled the store's video surveillance recording and saw the defendant come in the store and hand Carmona a check which she cashed "without even looking at it." Williams believed it was check 2972.

Williams testified that sometime later, David Gladney contacted him inquiring into who had cashed checks on his account, and Williams gave him the defendant's name. Detective Farris also questioned Williams about who had cashed the checks, and Williams identified the defendant from a photographic array.

Angel Warrick, a former employee of Two-Way Market, identified the defendant in court as someone she previously had seen in the store. Warrick identified her initials on check number 2971 and said she accepted that check as a cashier at Two-Way Market. She was "99.9 percent" certain the person she accepted the check from was the defendant. Warrick identified the defendant out of a photographic lineup as the person who asked her to cash the check. Warrick did not remember Lori Beth Mooningham coming into the store.

Detective Brian Farris with the Bedford County Sheriff's Department testified that he received a telephone call from David Gladney on July 23, 2007, informing him that his wife's checkbook had been stolen and some of the checks had been cashed by the defendant at Two-Way Market. Detective Farris showed Tim Williams and Angel Warrick photographic arrays from which both identified the defendant. Detective Farris later interviewed the defendant, and the defendant denied knowing anything about the checks. During the interview, the defendant "bec[a]me belligerent and [Detective Farris] terminated the interview." He interviewed Mooningham, and she admitted to signing two of the checks for which she was charged with two counts of forgery.

The jury convicted the defendant of forgery in counts one, three, four, five, six, seven, nine, and ten, and of the lesser-included charges of both attempted forgery and facilitation of forgery in counts two and eight. Noting that the even-numbered counts were alternate theories of the odd-numbered counts, the court merged the defendant's convictions in counts two, four, six, eight, and ten into his convictions on counts one, three, five, seven, and nine.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant challenges the sufficiency of the evidence convicting him of five counts of forgery. Specifically, he argues that there was no proof he intended to harm or defraud anyone. When reviewing a challenge to the sufficiency of the convicting evidence, we note that the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979);

-4-

<u>see also</u> Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); <u>State v. Evans</u>, 838 S.W.2d 185, 190-92 (Tenn. 1992); <u>State v. Anderson</u>, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. <u>See</u> <u>State v. Pappas</u>, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." <u>State v. Grace</u>, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

<u>Bolin v. State</u>, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing <u>Carroll v. State</u>, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. <u>See</u> <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982).

Tennessee Code Annotated section 39-14-114 provides, in pertinent part:

(a) A person commits an offense who forges a writing with intent to defraud or harm another.

(b) As used in this part, unless the context otherwise requires:

(1) "Forge" means to:

(A) Alter, make, complete, execute or authenticate any writing so that it purports to:

(i) Be the act of another who did not authorize that act;

. . . .

(C) Issue, transfer, register the transfer of, pass, publish, or otherwise utter a writing that is forged within the meaning of subdivision (b)(1)(A)[.]

Tenn. Code Ann. § 39-14-114(a), (b)(1)(A)(i), (C) (2006).

In the light most favorable to the State, the evidence shows that the defendant was at Lab Corp the day Mrs. Gladney's purse was stolen from the kitchen of the building and Mrs. Gladney saw two men standing in the kitchen. After leaving Lab Corp, the defendant "was sort of kind of laughing and was talking about spending other people's money." Later that day, the defendant had Mooningham drive him to a residence near Bell Buckle and Wartrace, an area nowhere near Manchester, where he returned with a blank check he asked Mooningham to fill out. The defendant claimed to have done work for the elderly woman living at the residence and explained she was too feeble to fill the check out herself. Mooningham filled out check number 2969 in the amount of $120 and signed it "Cathy Gladney." Two days later, the defendant had Mooningham drive him to the same house and, following the same procedure, went in the house and returned with another blank check. The defendant had Mooningham fill out the check, number 2972, in the amount of $135 and signed "Cathy Gladney." At some point while the defendant was in the car with Mooningham, he "made a statement like, I wonder if they're missing their money now . . . and was just laughing."

Angel Warrick, an employee of Two-Way Market, cashed check number 2971 and was "99.9 percent" sure she cashed it for the defendant. Tim Williams, owner of Two-Way Market, testified that he personally cashed check number 2975 for the defendant, whom he had known for about eight years. The defendant told Williams that he had done work for the Gladneys. Williams observed the defendant on the store's video surveillance recording cashing check 2972. Checks 2969 and 2973 were also cashed at Two-Way Market. Cathy Gladney signed an Affidavit of Forgery with her bank indicating that she did not authorize check numbers 2969, 2971, 2972, 2974, and 2975. The Gladneys live in Manchester.

The defendant's allegation that his lack of intent to defraud anyone was evidenced by his cashing the checks at a place he was well-known is without merit. The proof indicated that the defendant had trouble finding anywhere else to cash the checks, and he told Williams he had done work for the Gladneys as an explanation for his cashing the check, yet Cathy Gladney did not know him. Based on the direct and circumstantial proof, a rational jury could have found that the defendant intended to defraud or harm Cathy and David Gladney and thus convict him of forgery.

## II. Sentencing

The trial court conducted a sentencing hearing, at which the defendant admitted that he took Cathy Gladney's checks into Two-Way Market to get cashed but claimed he did so for Mooningham. He said that "at the time [he] didn't know it wasn't no good or [he] wouldn't have took them in there." He denied that Mooningham took him to Wartrace to get checks from a woman living there; instead, Mooningham presented checks to him when she returned from Tullahoma. The defendant stated that he is self-employed as a painter and roofer and would return to that work upon release. Asked if he had a place to live, the defendant said he would be staying with "a lady that I've been talking to while I was in jail since I got saved[.]"

On cross-examination, the defendant acknowledged that he had his probation on other sentences revoked before but claimed that was "[m]ainly just for not showing up on time and not making a payment." He said that when his probation was revoked in 2007, he was going through a divorce. He recalled that when his probation was revoked in 2005, "that's the time [his] sons got put in jail." Asked if he was going through a divorce or if someone was sent to prison when his probation was revoked in 1997, the defendant stated, "Yeah. Or Ben White was having problems. It was just something."

The court imposed a two-year sentence on each of the five convictions and ordered that all of the sentences be served consecutively except for the sentence in count nine which was ordered to be served concurrently with the sentence in count seven, for an effective term of eight years. The court ordered that the defendant serve his sentence in confinement.

The defendant argues that the trial court imposed an excessive sentence. Specifically, he asserts that his criminal record was not extensive, partial consecutive sentencing was not appropriate, and that prison resources would be better served on someone other than "a first-time nonviolent offender."

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record "with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2006). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000).

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210 (2006); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2006), Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

## A.  Length of Sentence

In imposing a specific sentence within a range, a trial court "shall consider, but is not bound by" certain advisory sentencing guidelines, including that the "minimum sentence within the range of punishment is the sentence that should be imposed" and that "[t]he sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors[.]" Tenn. Code Ann. § 40-35-210(c)(1), (2).  The weighing of the various mitigating and enhancement factors is "left to the trial court's sound discretion." State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008).

The possible sentence for a Range I offender convicted of a Class E felony is one to two years.  See Tenn. Code Ann. § 40-35-112(a)(5).  The court enhanced the defendant's based on his prior record of criminal convictions, failure to comply with the terms of a sentence involving release in the community, and because he was on probation when the offenses in this case were committed. Id. § 40-35-114(1), (8), and (13).  The court found the three enhancement factors "present in a very significant way."  The court found one mitigating factor present, that the defendant's conduct neither caused nor threatened serious bodily injury, id. § 40-35-113(1), but did not give that factor any significant weight.  As such, the court sentenced the defendant to two years on each of the five counts.

The defendant argues that the trial court erred in considering his criminal record "extensive" for enhancement purposes.  He asserts that ten misdemeanor convictions for a fifty-year-old man is "slight compared to most criminal defendants."  It is true that other defendants may have more extensive criminal records than this defendant; however, to enhance the defendant's sentence based on his record, the court only had to find that the defendant "has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[.]" Id. § 40-35-114(1).

The presentence report clearly supports this enhancement factor.  The report shows five convictions for theft under $500, one conviction for assault, three convictions for driving on a revoked license, and one conviction for failure to appear.  We note that misdemeanor convictions alone may support enhancement of a sentence based on prior criminal record.  See State v. Ramsey, 903 S.W.2d 709, 714 (Tenn. Crim. App. 1995); see also State v. Jackie J. Porter, No. W2004-02012-CCA-R3-CD, 2005 WL 2860255, at *3 (Tenn. Crim. App. Oct. 31, 2005) (upholding the enhancement of the defendant's sentence based on prior criminal record due to the defendant's two prior misdemeanor convictions, one for theft of property under $500 and one for simple possession of marijuana).  In any event, the trial court also enhanced the defendant's sentence based on his previous failure to comply with the terms of a sentence involving release in the community and because he was on probation when these offenses were committed, Tenn. Code Ann. § 40-35-114(8) and (13), both factors supported by the record.  We cannot conclude that the trial court abused its discretion in enhancing the defendant's sentences from one to two years on each count.

## B. Consecutive Sentencing

A trial court, in its sound discretion, may impose consecutive sentencing in accordance with Tennessee Code Annotated section 40-35-115, if it finds any of the following criteria by a preponderance of the evidence:

(1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person as declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b) (2006). These criteria are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing.

In addressing consecutive sentencing, the court noted that the defendant had an extensive criminal record and committed the present offenses while on probation. Id. § 40-35-115(b)(2), (6) (2006). The court stated that it "would be fully justified to make all of these sentences consecutive to one another" but, instead, only ordered that counts one, three, five, and seven run consecutively and count nine concurrently with count seven.

The defendant argues that the trial court erred in imposing partial consecutive sentences; however, the record supports consecutive sentencing in this case. Again, the presentence report reflects that the defendant had five prior convictions for theft under $500, three convictions for driving on a revoked license, one conviction for failure to appear, and one conviction for assault.

Although the defendant is fifty years old, his first conviction occurred when he was thirty-nine years old. Thus, he has amassed these ten convictions in a period of a little over ten years. The trial court may consider misdemeanor offenses in determining if an extensive criminal history is established. See, e.g., State v. Robert Smith, No. W2006-00998-CCA-R3-CD, 2007 WL 162181, at *4 (Tenn. Crim. App. Jan. 23, 2007), perm. to appeal denied (Tenn. May 21, 2007); State v. Nathaniel Robinson, Jr., No. E2004-02191-CCA-R3-CD, 2005 WL 2276421, at *7 (Tenn. Crim. App. Sept. 19, 2005), perm. to appeal denied (Tenn. Mar. 13, 2006). The presentence report also reflects that the defendant was convicted of two counts of theft under $500 on January 25, 2007, and sentenced to eleven months, twenty-nine days on each count. His sentences were suspended to supervised probation after service of thirty days on each count and the sentences were to run consecutively. Therefore, as found by the trial court, the defendant was on probation when he committed the forgeries in this case. The record supports the trial court's imposition of consecutive sentences.

### C. Manner of Service

The defendant argues that he "would be better served with probation or community corrections rather than serving an eight year prison sentence." He asserts that "precious Department of Correction[] resources" would be better served on other offenders.

As a standard offender convicted of Class E felonies, the defendant should be considered a favorable candidate for alternative sentencing in the absence of evidence to the contrary. Tenn. Code Ann. § 40-35-102(6) (2006). Moreover, because the defendant received a sentence of ten years or less, he was eligible for probation, and the trial court was required to consider probation as a sentencing option. Id. § 40-35-303(a), (b). The burden was upon the defendant to show he was a suitable candidate for probation. Id.; State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). In order to meet this burden, the defendant "must demonstrate that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995) (quoting State v. Dykes, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)), overruled on other grounds by Hooper, 29 S.W.3d at 9. There is no bright line rule for determining when a defendant should be granted probation. Bingham, 910 S.W.2d at 456. Every sentencing decision necessarily requires a case-by-case analysis. Id. Factors to be considered include the circumstances surrounding the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, and the best interest of the defendant and the public. Goode, 956 S.W.2d at 527.

A trial court may deny alternative sentencing and sentence a defendant to confinement based on any one of the following considerations:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Tenn. Code Ann. § 40-35-103(1) (2006). Additionally, a court should consider the defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate. See id. § 40-35-103(5).

In denying an alternative sentence, the court found that the defendant was not a suitable candidate for alternative sentencing because of "his extensive past criminal record and his complete inability to successfully complete probationary periods." The court found that the defendant "has no potential for rehabilitation without service of his sentence[,] [a]nd . . . that the risk that he would commit yet another crime if released on probation is extremely high."

The presentence report reflects that the defendant had ten prior misdemeanor convictions, had a ninth grade education, and owed over $7000 in unpaid fines, costs, restitution, and civil judgments. As noted by the trial court, the defendant has illustrated a past inability of completing probationary periods. He has received probation on other offenses and had that probation revoked in 1997, 2005, and 2007. Moreover, the defendant committed the present offenses while on probation for two counts of theft under $500. The defendant's evidenced disregard of the terms of probation reflects poorly on his potential for rehabilitation, and the record supports the trial court's conclusion that the "risk that [the defendant] would commit yet another crime if released on probation is extremely high." The trial court did not abuse its discretion in denying an alternative sentence.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE

-11-